## MAURICE A. MURRAY *vs.* MAXIMILLIAN L. LIZOTTE.

### JULY 9, 1910.

PRESENT, Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ..

(1)  *Contracts Contra Bonos Mores.*

Where complainant, having been employed by a petitioner in a divorce proceeding, in a relation involving trust and confidence, severed his connection with her, claiming that his bill for services had not been paid, and a few months later entered the employment of respondent in such divorce proceeding, in the same relation, such a contract with said respondent is *contra bonos mores,* and will not be enforced.

Where, under such circumstances, money was alleged to have been placed in the hands of an attorney for the respondent in the divorce petition, to be paid to complainant, upon complaint to the court against the attorney for withholding payment of the money, relief will be denied, as such contract is *contra bonos mores,* and, further, because the relation of attorney and client did not exist between the parties, and also because the testimony concerning the purpose for which the money was left with the attorney being conflicting, the court will not settle such a dispute in a summary proceeding, but will leave the parties to their remedies, in the usual manner.

(2)  *Attorneys at Law. Unprofessional Conduct. Contract Contra Bonos Mores.*

Where it appears that an attorney, with knowledge that a person had been employed by a petitioner in a divorce proceeding, in a confidential relation, after such agent had ceased to act for such petitioner, engaged such person to act for the respondent in divorce, in a similar character, and agreed to pay him for evidence to be obtained against the petitioner, the attorney is. guilty of unprofessional conduct.

COMPLAINT against an attorney-at-law.

DUBOIS, C. J.  This is a complaint against a member of the bar of this court, which reads as follows:

" *To the Honorable Supreme Court.*

"Represents the undersigned, Maurice Murray, of Providence, Rhode Island, that in the year 1909 he was doing business in Providence as a constable and rendering services in Providence and elsewhere as special investigator, and in other like capacities.

"That in the performance of such work he was engaged to do investigation, look up evidence and perform such other work as he might be directed to do in connection with a case pending in the Superior Court in said County.

"That on or about, to wit, the —— day of June, 1909, one Horatio Nelson Allin, of No. 15 Beacon Street, Boston, Massachusetts, who was acting as attorney in or in connection with said case delivered to Maximillian L. Lizotte, Esq., of Providence, R. I., an attorney of this Court, and who also was engaged as attorney in or in connection with said case, the sum of four hundred dollars ($400.00) with the direction to deliver said sum to the undersigned, Maurice Murray, on account of his services and expenses in said case, and said Lizotte accepted and received said sum of money under and with said directions.

"That thereafter, the undersigned having learned of the delivery of said sum for him to said Lizotte, requested said Lizotte to pay the same to him. That in, to wit, June, 1909, said Lizotte delivered to said Maurice Murray of said amount the sum of twenty-five dollars, and again in, to wit, July, 1909, delivered to him of said amount the sum of twenty-five dollars, but otherwise said Lizotte has paid to said Murray of said amount no sum or part thereof although said Murray has repeatedly and continuously urged the payment to him of the balance, to wit, three hundred and fifty dollars ($350.00) of said sum.

"Said Murray claims and avers that said sum of four hundred dollars was paid to said Lizotte and accepted by him for the specific purpose of delivering said sum to said Murray, and the detention of any part of said sum by said Lizotte is entirely wrongful and in violation of the duty of said Lizotte, both as a citizen and as an attorney of this court, and is a violation of the law of this State.

"Wherefore said Murray prays that this Court may take such action herein as the circumstances call for and as to this Court shall seem meet.

                                        "MAURICE MURRAY."

At the hearing before the court the complainant testified in support of his complaint, *inter alia,* as follows:

"Q. (By MR. COONEY): Mr. Murray, you are Maurice A. Murray? A. Yes, sir. Q. The complainant in this case? A. Yes, sir. Q. Where do you live? A. 283 George Street. Q. How long have you lived in Providence? A. About all my life. Q. And what is your occupation? A. Constable, private investigator or detective. Q. Are you the Maurice A. Murray who brought this complaint? A. I am. Q. Had you been employed by the petitioner in the case *Warren* v. *Warren?* A. I had. Q. When did you enter Mrs. Warren's employ? A. August 22, 1908. Q. By whom were you employed? A. Mr. Bassett and Mrs. Warren. Q. Now when if you did, did you cease rendering services to Mrs. Warren? A. About the middle of January, 1909. Q. During the time you were working for Mrs. Warren, while Mr. Bassett was connected with the case, did you make investigations? A. I did, sir. Q. What did you do with the investigations you made? A. I made reports. Q. In what manner? A. Typewritten reports by Miss Joseph from Mr. Lizotte's office who done my work. Q. When you ceased working for Mrs. Warren in January, 1909, I will ask you whether or not you had disclosed either to her or Mr. Bassett all the information you and your men had gained while working for her? A. Certainly I have, everything. Q. Did you give the names of the witnesses? A. They had all there was. Q. Do you remember meeting Mr. Allin at Mr. Lizotte's office in the summer of last year? A. I do. Q. Had you ever seen Mr. Allin previous to June or July of last year? A. I had. Q. How long prior to June or July of last year had you seen Mr. Allin? A. Six or seven years. Q. In what capacity had you been connected with him at that time? A. The Mellin case. THE COURT: Divorce case? A. Yes, your Honor. Q. Where was that cause tried? A. Boston. Q. You say you had these reports to Mrs. Warren and Mr. Bassett drawn up in Mr. Lizotte's office by Miss Joseph? A. Yes, sir. Q. Was she the stenographer? A. She was. Q. I will ask you, Mr. Mur-

ray, whether or not all the information you had obtained had
been turned over to Mrs. Warren before June of last year?
A. Everything before the 15th of January.   Q. Now relate
to the court the circumstances of meeting Mr. Allin at Mr.
Lizotte's office, the first time you met him, last summer.
A. They telephoned my office to come down to Mr. Lizotte's
office.   Q. Who telephoned, if you know?   A. I don't know;
I presume it was Mr. Lizotte.   Q. Very well, you got down to
Mr. Lizotte's office,—now what happened when you got in
there?   A. I met Mr. Allin; we had some talk about previ-
ously meeting some years before, then the conversation turned
on this Warren matter.   It seemed that Mr. Allin hadn't seen
me for some time and really had forgotten me until we men-
tioned the fact of the Mellin case and then we talked a few
minutes upon that matter and come back to the Warren case.
Q. Who first suggested the Warren case?   A. That, I couldn't
say.   Q. Do you remember what Mr. Allin said about the
Warren case in that conversation?   A. No, I don't recall.
Q. Do you remember whether or not at that time you told
Mr. Allin you had been in the employ of Mrs. Warren?   A. I
did.   Q. Did you or not tell how long before that occasion
you had ceased to work for Mrs. Warren?   A. I did.   Q.
Was the suggestion of your entering his employ brought up?
A. It was.   Q. By whom?   A. Mr. Allin.   Q. What was
said by Mr. Allin to you and by you to Mr. Allin?   A. He
asked if I was employed then by Mrs. Warren.   I said I was
not.   He asked how long since I had been employed and I said
not for five months.   Q. Did he ask if you had been paid up?
A. I don't think he did, but I think I advanced that informa-
tion.   He asked if I had gotten through with them, and I said
"yes."   I cannot state just what was said, but I know I said
I had not been paid; that I was indebted to men who worked
on the case; I had no money for them; I had some, but not
anywhere near as much as I should have.   Q. How much had
you been paid up to that time?   A. $260.   Q. Now tell what
was said—you were going to work for Mr. Allin.   A. He said
he would like to engage me on the matter if I was free.   There

were a number of witnesses all over the country he wished me to investigate for him. I told him I would be glad to do it, but I would require some substantial retainer in the matter as I had done all I proposed to do in the Warren matter unless I was paid. THE COURT: How much of a balance did you have for your services to Mrs. Warren? A. Somewhere around two thousand dollars. THE COURT: In addition to $260? A. Yes, your Honor. THE COURT: Had you rendered a bill at any time? A. I had, to Mr. Bassett. Q. What was said by Mr. Allin when you said if you were going to work for Mr. Warren's side you would have to get your money? A. He said, 'I will pay you.' I told him I would need some money, it would be necessary to have four hundred or five hundred dollars to start with. Q. Who was present? A. Mr. Lizotte. Q. What did Mr. Allin say about the sum of four or five hundred dollars at that time? A. I told him I would require that amount at that time. It would be necessary, I thought, to have a sufficient amount to start with; he said he would give me the money, send it to me or give it to Mr. Lizotte. Q. Now at the time you said you would need about four or five hundred dollars as a retainer, was there anything said that you would withhold anything from Mrs. Warren you had obtained while in her employ? A. No, sir. Q. Any suggestion made that you would suppress or withhold any information that you had obtained while in Mrs. Warren's employ and that you agreed to enter Mr. Allin's employ at the price of $400 down? A. Never. Q. Did you get the money on this occasion of Mr. Lizotte and Mr. Allin being present? A. I did not. Q. What was understood between you and Mr. Lizotte and Mr. Allin in regard to this money? A. He was to come down or send the money or bring it when he come again. Q. Who was he to pay it to? A. He was to give it to Mr. Lizotte if I was not there and Mr. Lizotte to give it to me. Q. Was there any understanding that you were to be present? A. There was not. Q. Were you and Mr. Lizotte on good terms? A. Very. Q. How long had you been typewriting these reports in Mr. Lizotte's office, using his stenographer to typewrite them?

A. From August 22d or 23rd, 1908.   Q. Do you know whether
or not Mr. Lizotte knew you were having these reports written
out?   A. I do not.   Q. Had you authorized the stenographer
Miss Joseph to disclose that fact to Mr. Lizotte?   A. I had not.
Q. And if she had done it was it with your approval?   A. It
certainly was not."

Horatio N. Allin, Esq., also testified in support of the com-
plainant, his testimony being in past as follows:

"Q. (By MR. COONEY):   Mr. Allin, what is your profession?
A. I am an attorney-at-law.   Q. Of what bar?   A. Middle-
sex.   Q. What Commonwealth?   A. Massachusetts.   Q. And
how long have you been practicing before the Commonwealth
of Massachusetts?   A. I was admitted to the bar December,
1880.   Q. And your office is where?   A. 15 Beacon Street,
Boston.   Q. What courts do you practice in in Massachusetts?
A. In all the courts.   Q. Are you a member of any United
States Court, bar?   A. For the district court.   Q. Do you
know Maximillian L. Lizotte, the respondent in this case?
A. I do.   Q. When did you first meet Mr. Lizotte, Mr. Allin?
A. I am unable to give you the date.   It was some time, I
should say, approximately, about the 20th of June, 1909, I
think.   Q. Where did you first meet him?   A. In Young's
Hotel, Boston.   Q. Will you relate the circumstances in which
you met him?   A. I was introduced to him by a partner of
Edmund M. Warren, my client.   And that was by an appoint-
ment, I think made by Mr. Bean who was the gentleman who
introduced me.   I think it was made by Mr. Bean and he also
introduced me to Mr. Lizotte, and I think Mr. Lizotte and I
then had an interview after.   Q. Was Mr. Murray's name
mentioned at the interview in Boston, the first time you met
Mr. Lizotte, Maurice A. Murray?   A. My apprehension is it
was.   Q. How long have you known Mr. Murray, the com-
plainant in this case?   A. I knew Mr. Murray, somewhere, I
don't like to state definitely, but I think six or seven years
ago, may be eight years.   Q. Had he ever done any work for
you prior to the time you met Mr. Lizotte?   A. He had.   Q.
What was it?   A. It was in a case we tried in Boston, a case

of some importance. I procured Mr. Murray's services at that time to assist me in the case. Q. What was the name of the case, if you remember? A. That case was *Mellin* v. *Mellin*. Q. Now, when you heard Maurice A. Murray's name mentioned at the interview with Mr. Lizotte, did you recall the man? A. I did. Q. Will you tell the court what was said by Mr. Lizotte to you about Mr. Murray at the time at Young's Hotel, Boston? A. I didn't charge my mind, it would be quite impossible for me to state the exact language of the interview, but I think I can give it in substance. Our interview started out with some conversation, as I recall now, with reference to the fact that Mr. Lizotte formerly lived in Lewiston, Maine, and Mr. Bean, who introduced me, a partner of Mr. Warren, has also been a resident of Maine and I think an attorney there. The matter then turned upon the Warren case and Mr. Lizotte, as I recall, suggested, he thought they could be of some service to me, and I think he spoke to me of his associate named Mr. Crafts and also Mr. Murray. Q. What Warren case was referred to in that interview? A. That was a case brought by Mrs. Warren for a separation, divorce, and it also involved the question, at that stage, in its inception, of alimony by way of injunctions being brought, *lis pendens*, being filed in different states, I think Maine, New Hampshire, Massachusetts, and Rhode Island. Q. And as a result of that interview with Mr. Lizotte in Boston, was anything said about your coming to Providence to have a talk with Mr. Murray? A. My recollection is we were having hearings at that time. Q. At what court? A. That was the Superior Court, in Providence. My recollection is we were about that time to begin upon some of the case by a court hearing upon the divorce proceeding which did, I think, ultimately begin two or three days before the court adjourned for vacation, and I think there were two or three days of the hearing. Q. Well, did you come down to Providence to take part in one of those hearings? A. I think I was coming the following Saturday. Q. Did you call in this connection, following the interview in Boston, at Mr. Lizotte's office? A. I did. Q. Tell the court what trans-

pired at that time, at Mr. Lizotte's office.   A. I went into Mr. Lizotte's private office and shortly after that Mr. Murray came in.   Q. Who was Mr. Murray?   A. He was the gentleman who I recognized had served me some time before that.   Q. Had you and Mr. Lizotte talked about anything concerning this matter before Mr. Murray came in?   A. I couldn't state that.   Q. When Mr. Murray came in, did you and Mr. Lizotte have some talk about this matter?   A. I think Mr. Murray and I had a short conference, and then Mr. Lizotte came in. He was with us at the conclusion of it.   Q. Will you tell us what was said and done at Mr. Lizotte's office?   A. We had some talk at that time with reference to who, I had no associate here, who was to be employed by me in the trial of the case.   A Mr. Johnson had appeared for me for acceptance of service.   This being a case of some importance I desired to get as good ability as I could in Providence, and Mr. Lizotte spoke to me about his partner, Mr. Crafts.   We talked some about that.   I told him I would have to consult with Mr. Warren with reference to that, as it was possible Mr. Warren might have a choice in that matter.   If he had I should not attempt to object as I always desired to have the client use his own choice, and then he would not throw that responsibility upon the attorney.   Mr. Lizotte and I, I think we talked that before Mr. Murray came in and Mr. Murray came in after that and we had some talk, I think upon these lines: that I told Mr. Murray I was glad to meet him; he had served me before and this was a case in which I desired a great deal of work done.   I needed a utility man, I was practically a stranger and wanted some one who could get witnesses in the case, who could assist me in the general work I wanted done outside, and I will not be positive whether it was then or after that that the matter was referred to as to his having been engaged or employed on the other side.   Q. The other side of what?   A. The other side of the case we were talking about.   In other words, he had been employed by Mrs. Warren before that, had ceased his employment and he was all through with the case. Q. Was anything said as to how long before this interview?

A. It doesn't lie in my mind now. I don't recall that that
was particularly referred to. Q. Go ahead, Mr. Allin. A.
Well, I think I asked him if he was employed or had been
engaged in work on the Pawtucket Benedict House matter
and he said that was one of his matters. I said I didn't care
anything about that matter one way or the other. 'What I
desire you for is, you render your services to me, whatever we
want from time to time, and those matters I will attend to
outside.' I had investigated the Benedict House matter, as I
recollect it now, at that time and had that information before
that. I had met Mr. Bassett who was counsel for Mrs. Warren,
and in a conversation with him he stated he did not rely on
that matter, cared nothing about it. I am not sure whether
I had the bill of specifications at that time or not; but I sup-
posed that matter there was a germane matter in the case the
other side relied on, and I cared nothing about that. I sup-
posed that was what Mr. Murray had been working on. If I
had the specifications at that time, my impression is that there
was no allusion in those specifications to the time charged in
the bill, which I think was somewhere from the 3d to the 5th
of September, 1908. And I think that date was not included
in the libel. I will not be sure about it, either that or the date
I had obtained in the Benedict House matter was not included
in those specifications. That was my recollection. Q. Now
won't you tell further about Mr. Murray's connection with
Mrs. Warren? A. Mr. Murray stated that he had rendered
services to Mrs. Warren for some time previous to that. I
wouldn't say, a year or six months; that he had received no
considerable money. Q. And had not been paid? A. He
informed me, I think, that he had not; that he had worked
for her and had not been paid, and that he was financially
somewhat embarrassed, and if he rendered his services to me
in the case he should require some money in advance. Mr.
Lizotte at this time, as I recall it, was in the room. Q. He
was present at this conversation? A. He was present at this
conversation, to the best of my recollection. I asked him what
he asked, and my impression is that he named four or five

hundred dollars. I told him that I thought that the case would require a very considerable amount of work, and that I was willing to pay him at that time $400. I felt sure that he would earn that and more too, and I think it was agreed between Mr. Murray and myself that I was to pay that amount of money. I didn't have a check-book with me at that time or that amount of money, but I stated that I would leave it to be paid to Mr. Murray on my return to Providence. I would probably be down in a day or two. It was then understood that I should leave the money there. Q. With whom were you to leave it? A. Mr. Lizotte. Q. The respondent here? A. This gentleman. Q. Was he present at the time this understanding was reached, that that money should be left with him? A. I think he took part in that conversation. Q. For whom was it to be left with Mr. Lizotte? A. For Mr. Murray. Q. Now you went away at the end of that conversation? A. I did. Q. When did you come back, if you did? A. My recollection is that it was within a day or two. Q. Did you call upon Mr. Lizotte on your return to Providence and give the money to him, in his hand? A. I called and left the money. I gave it to Mr. Lizotte, personally. Q. How much did you give him? A. $400, the amount I was to pay. Q. What did you say to him when you left the money with him at that time? A. I couldn't state—perhaps general conversation. Q. Don't you recall any particular instance that impressed you? A. I do not. Q. Was this money that you left with Mr. Lizotte the money you had agreed to pay Mr. Murray? A. This was the money I agreed to leave there for Mr. Murray."

The respondent's version of the affair appears in the following extract from his testimony: "Q. (By MR. FITZGERALD): You are a member of the Rhode Island Bar, Mr. Lizotte? A. I am. Q. Have you at any time been associated with the conduct of the Warren divorce case? A. I was. Q. How did you first become connected with that case, Mr. Lizotte? A. By appointment with a friend of mine, Joel Bean, I met Mr. Allin at Young's Hotel, Boston. Q. Where did you first

meet Mr. Bean in reference to it? A. Some time after this Warren case had been started and known to be pending, I saw Mr. Bean in Providence here. I would say I knew Mr. Bean in Lewiston, Maine, when I practiced law there, and was associated with Mr. Warren, the same place where he was practicing law. We were associated together more or less. Q. You met Mr. Bean here? A. Here in Providence. Q. What did that have to do with your connection in the Warren case? A. We talked it over. Mr. Bean suggested to me in a way, he was interested with Mr. Warren, as to whether or not if Mr. Warren wanted my services whether I would want the case. I told him I certainly would. Later on he telephoned me from Brockton he had made an appointment with Mr. Allin to meet me at Young's Hotel, and in consequence of what he told me I went to Boston and he introduced me to him. Q. Who introduced you? A. Mr. Bean. Q. Did Mr. Bean stay there after he introduced you? A. He was there a little while, talking with us, general conversation, and then he went away. It was a very rainy night, and he desired to go home. He introduced me to Mr. Allin as an attorney he knew from Maine, and said without any doubt I would be of some service to him in Providence, and thought it was advisable that I should become an attorney in the case. Q. Did you converse with Mr. Allin after that in reference to coming into the case? A. After that Mr. Allin and I talked along together, talked for quite awhile, half or three-quarters of an hour, possibly longer. Q. Was anything said by you and Mr. Allin in connection with the Warren divorce case? A. Yes, sir; Mr. Allin told me he wanted an attorney here to take part, certain part, in this case, look up testimony, and one thing and another; said he had a Mr. Johnson's brother in the case and his duties in the case would be to look out for motions and one thing and another, and he wanted another attorney to assist him, help in the court litigation, look up testimony and law and stuff like that. Q. Did you at that time agree to enter into the case with him? A. I did. Q. Was anything said at that meeting at Young's Hotel, Boston, in regard to Mr. Maurice Murray?

A. No, sir; not at that time, the matter of Mr. Murray's name was not mentioned at all. Q. Do you remember anything else that took place in conversation, any more of the conversation that took place between you and Mr. Allin at Young's Hotel, Boston? A. No more than we talked about the fact that I knew Mr. Warren in Maine and knew him to be associated with Mr. Bean there and had been in their office. I knew both of them quite well, Mr. Bean better than I did Mr. Warren, and he explained to me the case more or less, and said it went over. And we talked about that case and other matters generally. Q. When did you next see Mr. Allin? A. I believe that two or three days afterwards Mr. Allin came to Providence to my office. In Boston, when I left him, he said he would come to Providence as soon as he could, and I left him, and he would call then and make arrangements. Q. You say he afterwards come to your office, Providence? A. Yes, he did. Q. What happened at that meeting? A. Well, we talked the case over. I told him I had seen Murray and talked this matter over. I knew Murray—THE COURT: At the interview in Boston no mention was made of Mr. Murray. A. I don't recall that I mentioned Murray's name in Boston, and I don't know. THE COURT: You said that when he came to Providence you told him you had seen Murray. A. When we came into Boston. THE COURT: Into Boston or Providence? A. In Providence, in my office. I told him that if he wanted the services of a detective here I knew of a man, and from what he told me I gathered he would have to have a man to go around to different cities, because the case took in several States, Maine, New Hampshire, Massachusetts, Rhode Island, matters connected with reference to witnesses, property, and one thing and another. And on account of that, I told him of Mr. Murray. I thought he would make him a good man. I knew Murray; he had assisted in several cases. Q. Did he, at the time you mentioned Mr. Murray's name to him, say that he knew Mr. Murray? A. No, but Mr. Murray told me he thought he knew Mr. Allin, if he was the Mr. Allin he did some work for previously. Q. When did Mr. Murray

tell you that? A. At one of the talks we had. Q. Talks that who had? A. Murray and I. Q. Prior to the time you met Mr. Allin? A. No, after. Q. Now, at that first time in Providence, the first visit in. Providence, was Mr. Maurice Murray present? A. I telephoned for him, I believe. He wasn't present when Mr. Allin came in. After I told Mr. Allin of Mr. Murray and the talk we had had together, and the line of evidence we would need, I advised Mr. Allin to see Mr. Murray, and he says, 'All right,' and in consequence of some further talk, I telephoned, and Mr. Murray came in. Q. Was anything said about Mr. Murray's connection with this case before Mr. Allin hired him? A. No. Q. Did you mention that Mr. Murray had been employed by Mrs. Warren, to Mr. Allin? A. No, I did not. Q. Did you know it? A. Well, I knew it in a way, because he used to come into the office there, it would be four or five months previous to this thing, and dictated reports to our stenographer, Miss Joseph. But I had not talked to him about the matter, and it did not interest me then because I knew little about it. Q. Did you know at that time whether or not he was employed by Mrs. Warren's end of it? A. I knew that he had ceased his connections with Mrs. Warren and had nothing more to do with it, and had not for several months. Q. Had you ever had anything to do with the reports that he had made while in the employ of Mrs. Warren? A. No, not at all. Q. Had you ever seen them? A. No. Q. Ever had them read to you? A. No. Q. Did you ever inquire in regard to them? A. No. Q. Did you know at that time anything of the work he had done for Mrs. Warren? A. No, sir. Q. Did you know at that time of this Kyle affidavit? A. I knew nothing of this Kyle affidavit until along, I should say, in September, the first I ever heard of this Kyle affidavit. Q. September, what year? A. 1909. Q. At that first meeting had at your office in Providence, when Mr. Murray came in, was anything said to Mr. Allin about it? A. Nothing at all. We talked over this Kyle affidavit, but much later, I should say in September. Q. How did you first hear about the Kyle affidavit? A. I think that in one of the

interviews the question of the Pawtucket matter came up as well as the mention of an affidavit, and then I asked Mr. Murray about this affidavit, and he told me about it. I said, 'Was it ever used or will it ever be used?' He says, 'No, it will not be used because it wasn't correct, the party that made the affidavit was mistaken as to the identity of the man.' Q. Murray told you that in September? A. I should say September. Q. Now, in the first meeting in your office, were any arrangements made by which you employed Mr. Murray? A. Mr. Allin and myself both talked together with Mr. Murray, and he was willing to go into the case to get a certain line of evidence. We were trying at that time to get a line of evidence against Mrs. Warren's character. . . . And we talked over that line of evidence. Q. Did Mr. Murray say anything about his being able to get evidence as to her character? A. He said without any doubt, he could get evidence enough 'to hang her three times,' to use his words. Allin says, 'That's pretty good; that's just what we want. If we can show the court Mrs. Warren has not been a good and faithful wife, I think it will have a great deal to do with the case.' Mr. Murray assured us both that he could get such evidence. Q. Was any agreement made? A. Yes, sir. Mr. Murray was supposed to go out and get this evidence, that was the evidence Mr. Allin wanted most. Q. Was there any agreement as to his compensation? A. I remember now one instance Mr. Allin said, 'Murray, if you can go out and get that evidence, we will pay you well.' Murray said, 'All right,' or words to that effect. Q. Now was any money given to Murray about the time of that meeting? A. No, sir. Following this time, Mr. Allin came into my office, I believe possibly a day or two after. I, said to Mr. Allin, 'Mr. Murray wanted some money. He said he ought to have some if he does any work, if he helps us.' I believe I sent for Murray at that time, and he came there, and I said to Murray, in the presence of Mr. Allin, said in substance, 'I have told Mr. Allin you wanted some money for your services. If you do anything, he is willing to pay you.' I suggested to Mr. Allin to send some money

down, and Mr. Allin says, 'Yes, that's so. Murray can go and
get his evidence, such as you told us you could get. I have
agreed with Mr. Lizotte to send some money both for himself
and for you, and for other witnesses and other expenses,' and
put it that way. Mr. Allin said he would send me $400.
Q. Was that said in the presence of Mr. Murray, the amount
Mr. Allin would send you? A. I couldn't say whether Mr.
Murray was there then, but I did tell Mr. Murray after Mr.
Allin left there how I was supposed to use it. I told him that
I asked Mr. Allin for $400. I wanted $200 for myself and Mr.
Crafts as retainer fees, and the other $200 I would use as I
needed it for expenses and evidence, 'and for you if you get
such evidence as we want.' Q. Did you at that time give
Mr. Murray any money? A. No; not that date. Q. When
did you first give Mr. Murray any money in this case? A. A
day or two following Mr. Murray came into the office. He
said, 'Mr. Lizotte, I want some money. I want it bad.' I
says, 'I know that before.' He says, 'I've got a note to meet
in the bank which another friend of mine endorsed which is
due to-day, of $25, and must have $25 to-day or this friend
of mine will possibly think I was not using him right. You
advance me $25 and when I get some money from Allin I will
return it to you. I finally gave him a check for $25. He
went out with the check and came back two or three hours
afterwards with a new suit of clothes, new shoes, and new
Panama hat. I said, 'That's the friend you wanted to assist?'
He said, 'That's all right. I needed the clothes. That's the
way I talked to you to get the money.' Q. When next did
you see Mr. Allin? A. Possibly two or three days. Mr.
Allin came in and gave me $400. Q. Did Mr. Allin tell you
at that time you was to pay that money to Murray? A. He
says to me, 'Lizotte, here's $400; $200 for yourself and Mr.
Crafts, and the rest you want to pay to Murray if he gets any
evidence,' and he says, 'You know this is my money. Warren
is all tied up and can't give me any money, but we have got
to render an account to Mr. Warren. Use this money judi-
ciously, and it would be all right if you use it that way and can

give a fair account to Mr. Warren.' Q. What form of receipt did you give? A. I don't remember that I did, but I charged up in our books the amount that I received from Mr. Allin. Q. Did you receive four one hundred dollar bills, as Mr. Allin testified? A. Yes, sir; four one hundred dollar bills. Q. Did you see Mr. Murray that day Mr. Allin brought the money down? A. I did. Q. Where? A. At my office. Q. The day Mr. Allin gave you the money? A. The day Mr. Allin gave me the money. Q. Did Mr. Allin instruct you to turn it over to Mr. Murray, the four hundred dollars? A. No, sir; he did not. Q. Did Mr. Allin have any talk with Mr. Murray? A. We talked over the matter of a witness, Miss Vester, who once had been a maid for Mrs. Warren, so Mr. Allin said, and we told Murray to go out and see this Miss Vester. He went out, was gone an hour or so, and come back and Mr. Allin, I don't recall whether he was there or not when he came back, but at any rate I gave Mr. Murray $25 then and I told Mr. Murray, in the presence of our stenographer, that I had this four hundred dollars, and he knew all about it. Q. That time you gave him $25? A. Yes, sir; he took the money. I says, 'being somewhat of a stranger in this case I want to do what is right by Mr. Warren and Mr. Allin,' and he says, 'I can get evidence,' repeating his words, 'get enough to hang her two or three times.' I said, 'We don't want to hang her, but want to get evidence against her character, if there is any.' Then I explained to Murray, I took a blank divorce petition, and I read to him where it said that the petitioner had to come into court with clean hands, must show she was faithful to her husband or otherwise she wouldn't have her good standing in court, and he says, 'I can get enough of that stuff; I can get enough to hang her three times.'"

Mr. Bean's version of the reason why he introduced the respondent to Mr. Allin appears in his testimony, as follows: "Q. (By MR. COONEY). Mr. Bean, where do you live? A. I live now in Brockton, there most of the time. Q. What is your profession, Mr. Bean? A. Well, I am interested in land, real estate now; I practiced law in Maine until three years ago.

Q. How long have you been a member of the bar of Maine?
A. About ten years.   Q. When did you cease your practice
there and go into the real estate line?   A. About three years
ago.   Q. And you are located where now?   A. I have in-
terests in different places; I have a little boy in Brockton, and
that keeps me there most of the time.   Q. In your practice
of law in Maine did you meet Mr. Lizotte?   A. I did.   Q.
What was he doing at the time you met him?   A. Practicing
at the bar.   Q. Are you connected with Edmund M. Warren,
operating real estate?   A. Yes, sir.   Q. Were you connected
with Mr. Warren in any way while Mr. Lizotte and you were
in Maine together?   A. I had some business.   Q. Were you
and Mr. Lizotte associated together in Maine?   A. Mr. Lizotte
and I occupied the same office for a number of years.   THE
COURT:  What part of Maine?   A. Lewiston.   Q. (By MR.
COONEY).   Mr. Lizotte testified that in June of last year,
rather, he met you in Providence on the street, and that because
of your knowing him in Maine and being associated with Mr.
Warren who was then a respondent in a divorce proceeding
then pending, you suggested to him that he would be a valuable
man for Mr. Warren, and that you would bring about a meeting
between Mr. Warren or Mr. Allin, who was representing Mr.
Warren, and himself and rather suggested that he come into
Mr. Warren's side of the cause.   Now I will ask you first if
you met Mr. Lizotte in Providence on the street or elsewhere
and had any such conversation?   A. I did not.   Q. Did you
have any correspondence or communication with Mr. Lizotte
last summer in connection with this Warren matter?   A. Well,
yes; I did.   Q. Will you tell the court how you first became
acquainted with Mr. Lizotte in regard to this matter?   A. I
was operating a tract of land at Nantasket Beach, outside of
Boston, and I was taken to Boston two or three days a week.
Sometime prior to the divorce hearing, this Warren divorce,
Mr. Lizotte telephoned for me to call him up, and I called him
up.   He telephoned to me in Brockton to call him up.   He said
over the telephone, he stated he wanted to see me on important
business.   I asked what was the nature of it.   He said some-

thing about being of assistance to Mr. Warren in his divorce suit. I told him then I was friendly to both sides and did not care to mix up one way or the other in the suit. It was no use for me to see him because I was not interested. He wanted me to put him in touch with Mr. Warren. I saw Mr. Warren within a few days and said that Mr. Lizotte wanted to see him, had something that would be of interest to him, thought he could be of assistance to him. Mr. Warren suggested that Mr. Allin, his attorney, would know whether it would be of assistance or not and I had better call him and if Mr. Lizotte called me up again I could arrange a meeting. I telephoned to Mr. Allin and told him an attorney in Providence would like to meet him and I arranged the meeting and introduced Mr. Lizotte, at Young's Hotel, to Mr. Allin. I didn't remain but a minute because after I introduced him I had to catch a train, and I went home. Q. Did you take part in the conversation with reference to the Warren divorce case, at Young's Hotel, that night when you introduced Mr. Lizotte to Mr. Allin? A. I had to get away immediately. I didn't stay a minute. It was a rainy night, and I had to get my train."

The foregoing excerpts from the transcript represent less than one-twentieth of the entire volume of the testimony given at the hearing by the fifteen or more witnesses who testified, but it is sufficient for the purposes of this consideration. Much of the testimony taken necessarily was corroborative or contradicting, as the case may be, and need not be referred to except in this general way. In the consideration of this case, two questions arise for determination: first, is the complainant entitled to a summary order for the payment of the amount claimed by him against the respondent; and, secondly, has the respondent been guilty of unprofessional conduct in the premises. In answering each question, for the purpose of giving the utmost weight to the testimony of the party concerned, we shall decide the same upon his testimony alone. Thus, taking the testimony of the complainant to be literally true in all respects, is he entitled to the order he prays for? The answer must be, No. In the first place, assuming

(1) that the contract with Mr. Allin to be as claimed by the complainant, it is a contract *contra bonos mores*, and can not be enforced. The complainant, having been employed by Mrs. Warren in a relation involving trust and confidence, is under the implied duty of remaining loyal to her and her cause, whether his bill is paid or unpaid. He will not be permitted to sever the relationship, thus constituted, for the purpose of being employed by the other party to the litigation. No matter how high his motives or how honorable his intention, 'No man can serve two masters; for either he will hate the one, and love the other; or he will hold to the one, and despise the other." Neither can a man ride two horses going in opposite directions, at the same time; it is useless to attempt it. Fidelity must and will be required from all those holding fiduciary relations. They must not lightly enter upon such relationships; but if they do, they will not be permitted to be disloyal; and of all species of disloyalty, desertion and adherence to the enemy, or to the opposing party in a suit, is recognized as the worst. Another reason for refusing to grant the order might well be that the relation of attorney and client is not shown to have existed between the respondent and complainant, that under the case made out, according to the complainant, the respondent was a bailee who might be liable criminally and civilly for his breach of trust, but that he was not employed as an attorney at law to hold the money for the complainant. The fact that he was such an officer was merely incidental. The foregoing reasons are sufficient to dispose of the matter, but if we should return to the ordinary rule and consider the testimony on both sides, we would find that there is still a third reason for dismissing the petition: While the respondent admitted that he received the said sum of money from said Allin, he denied that it was entrusted to him for the specific purpose aforesaid, and claimed that half of said amount was given to him as a retainer for himself and an associate attorney and counsellor at law, and that the balance was to be devoted by him to the payment of expenses, incurred in the case wherein he was so retained, which was to include the

services of the complainant when rendered. In this claim the respondent was corroborated to some extent by witnesses. In view of the fact that the testimony concerning the purpose for which the money was left with the respondent is conflicting, and that there is such a dispute, this court will not attempt to reconcile the testimony or determine in whose favor the evidence preponderates, or to settle the dispute between the parties in a summary proceeding of this character, but will leave the parties to litigate their differences before the ordinary tribunals, having jurisdiction of such matters, in the usual manner. See *Peirce* v. *Palmer*, 31 R. I. 432.

(2)    Although we feel obliged, for the reasons heretofore given, to deny to the complainant the pecuniary relief which he seeks, this does not effect a complete disposition of the case. The conduct of an attorney of this court has been called in question, and will be scrutinized. For this purpose the testimony of the respondent is deemed to be literally true in all respects,— and what does it disclose? That he knew Murray had been employed by Mrs. Warren, in a case still pending, in a relation of trust and confidence. He "knew that he (Murray) had ceased his connections with Mrs. Warren and had nothing more to do with it and had not for several months." He also testified: "Mr. Allin and myself both talked together with Mr. Murray and he was willing to go into the case to get a certain line of evidence. We were trying at that time to get a line of evidence against Mrs. Warren's character. . . . And we talked over that line of evidence. Q. Did Mr. Murray say anything about his being able to get evidence as to her character? A. He said without any doubt he could get evidence enough 'to hang her three times,' to use his words. Allin says, 'That's pretty good, that's just what we want. If we can show the court Mrs. Warren has not been a good and faithful wife I think it will have a great deal to do with the case.' Mr. Murray assured us both that he could get such evidence." It thus appears that the respondent was a party to the contract whereby the complainant was to be employed in a manner not only disloyal but hostile to his former em-

ployer, and that the respondent was to pay him the price of his treachery, when the evidence thereof was duly presented, out of a fund entrusted to him for that purpose by Mr. Allin. We have already characterized the contract as being against public policy, and not to be countenanced. The complainant, although not excusable, by reason of his ignorance of the law, being a mere layman, although an investigator, presumably of facts and not of law, might well have presumed that, if the contract was an improper one for him to make, reputable attorneys would be the last persons to engage with him in the same. As "*Ignorantia legis neminem excusat,*" it is not to be presumed that the attorneys did not know the kind of a contract they were making. It is probably a case where zeal outran discretion. However this may be, it is time that a salutary lesson be given, to the end that fidelity and loyalty may be duly recognized and appreciated, and that lapses therefrom may receive proper condemnation. We are, therefore, of the opinion that the respondent has been guilty of unprofessional conduct in the premises and should be punished therefor. He is accordingly suspended from the practice of his profession until the tenth day of July, in the year 1911.

As there is no complaint as yet pending against Mr. Allin, a member of the Massachusetts bar, by comity engaged here in the practice of his profession in the case aforesaid, which he has had an opportunity to answer, there is no necessity for further consideration in relation to his conduct in the premises.

*Thomas F. Cooney,* for complainant.

*Fitzgerald & Higgins, Daniel A. Colton,* for respondent.